# IN THE COURT OF APPEALS OF TENNESSEE
# AT NASHVILLE
### September 3, 1998 Session

## CONSUMER ADVOCATE DIVISION v. TENNESSEE REGULATORY AUTHORITY

**Appeal from the Tennessee Regulatory Authority**
**No. TRA 96-01423      Melvin Malone, Director**

---

**No. M1997-00238-COA-R3-CV - Filed July 18, 2002**

---

The principal issue in this case is whether telephone directory assistance service is basic or non-basic under the statutory scheme. Secondary issues involve the practice of grandfathering existing customers when a new tariff is approved, the exemptions to directory assistance charges, and whether the Tennessee Regulatory Authority was authorized to transfer a contested case to another docket. We affirm.

**Tenn. R. App. P. 12 Petition for Review; Judgment of the Tennessee Regulatory Authority Affirmed**

BEN H. CANTRELL, P.J., M.S., WILLIAM C. KOCH, JR., J., WILLIAM B. CAIN, J.

John Knox Walkup, Attorney General & Reporter; Michael E. Moore, Solicitor General; L. Vincent Williams, Consumer Advocate; Vance L. Broemel, Assistant Attorney General, for appellant, Consumer Advocate Division.

Guy M. Hicks, Nashville, Tennessee and Patrick William Turner, Atlanta, Georgia, for appellee, BellSouth Telecommunications.

Citizens Telecommunication Company, Pro Se.

Dennis McNamee, J. Richard Collier and William Valerius Sanford, Nashville, Tennessee, and H. Edward Phillips, Wake Forest, North Carolina, for appellee, Tennessee Regulatory Authority.

Joseph F. Welborn, Robert Dale Grimes and Theodore G. Pappas, Nashville, Tennessee for appellee, United Telephone Southeast, Inc.

# OPINION

## PER CURIAM

This is a direct appeal by the Consumer Advocate Division [CAD] of the office of the Attorney General.

The genesis of this litigation dates from the filing of a tariff by United Telephone [United] with the Tennessee Regulatory Authority [TRA] for an increase in rates, particularly for directory assistance, which was provided without charge to a telephone customer.

The filing was made pursuant to Tennessee Code Annotated § 65-5-209(e) which allows regulated telephone companies that have qualified under a price regulation plan to adjust prices for non-basic services so long as the annual adjustments do not exceed lawfully imposed limitations.

Intervening petitions were filed by CAD, by Citizens Telecommunications Company of Tennessee [Citizens], by BellSouth Telecommunications, Inc. [BellSouth] and AT&T Communications of the South Central States, Inc. [AT&T], all of which were granted.

The telephone services described as basic services are subject to a four-year price freeze under Tennessee Code Annotated § 65-5-209(f), that is, if a service is basic, its rates cannot be raised for four years.

United insisted that directory service was not a basic service and hence not subject to the price freeze. As the case progressed, CAD raised other issues of (1) whether United was entitled to have its 911 Emergency Service and educational discounts classified as non-basic and therefore subject to a price increase; (2) whether a company could continue to offer a service to certain classes of customers while refusing the service to newer customers; (3) whether a previously approved tariff filed by United limiting to five the number of lines at a single location could be considered residential service.

By order entered September 4, 1997, the TRA ruled that (1) directory service is non-basic and approved the tariff as filed subject "to free-call allowance up to six inquiries with an allowance of two telephone numbers per inquiry for residents and business access lines per billing period," an exemption for customers over sixty-five and those with a confirmable visual or physical disability; (2) a previous tariff filed by United which limited the number of access lines that could be charged a residential rate to five per location was not proper to be considered in this proceeding; and (3) a previous tariff approving a business service to existing customers but denying it to newer customers was not proper to be considered in this proceeding.

CAD appeals and presents for review the issues of (1) whether directory service is a basic or non-basic service; (2) whether the TRA erred in holding that the five-line tariff would be

adjudicated in another proceeding; and (3) whether the TRA erred in holding that United could obsolete a business service, change its characteristics, and offer it to new customers for an increased price.

BellSouth presents an additional issue for review: Whether the TRA erred in requiring United to provide free directory assistance in certain instances.

United presents for review issues similar to those presented by CAD and BellSouth.

Appellate review is governed by Tennessee Code Annotated § 4-5-322(h) which provides:

> The [reviewing] court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision ft the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:
>
> (1)     In violation of constitutional or statutory provisions;
> (2)     In excess of statutory authority of the agency;
> (3)     Made upon unlawful procedure;
> (4)     Arbitrary or capricious or characterized by an abuse of discretion or clearly unwarranted exercise of discretion; or
> (5)     Unsupported by evidence which is both substantial and material . . .

### Directory Assistance

Tennessee Code Annotated § 65-5-209, a 1995 enactment, allows a telecommunications company to utilize a price regulation plan in the calculation of rates. This plan establishes, inter alia, a cap on the amounts a company can raise its rates for basic and non-basic telephone service as defined in Tennessee Code Annotated § 65-5-208(a)(1), with the maximum rate increase indexed to the rate of inflation, and the rates for basic service are frozen for four years from the date the company elects to be bound by the price regulation plan. United elected to be bound by the plan and its application was approved October 15, 1995. Tariff 96-201, the predicate of the case at Bar, sought a rate increase for non-basic services for an amount less than the rate of inflation. United proposed a charge for directory assistance because it was a non-basic service and therefore not subject to the price freeze. The TRA agreed, and approved the proposed rate increase subject to Tennessee Code Annotated § 65-5-208 as follows:

> Classification of Services – Exempt services – Price floor – Maximum rates for non-basic services. – (a) Services of incumbent local exchange telephone companies who apply for price regulation under § 65-5-209 are classified as follows:

(1) "Basic local exchange telephone services" are telecommunications services which are comprised of an access line, dial tone, touch-tone and usage provided to the premises for the provision of two-way switched voice or data transmission over voice grade facilities of residential customers or business customers within a local calling area, Lifeline, Link-Up Tennessee, 911 Emergency Services and educational discounts existing on June 6, 1995, or other services required by state or federal statute. These services shall, at a minimum, be provided at the same level of quality as is being provided on June 6, 1995. Rates for these services shall include both recurring and nonrecurring charges.

(2) "Non basic services" are telecommunications services which are not defined as basic local exchange telephone services and are not exempted under subsection (b). Rates for these services shall include both recurring and nonrecurring charges.

CAD insists that the TRA erred in its interpretation of the statute because directory assistance was a part of the "usage" enjoyed by customers who subscribed to telephone service, in contrast to United's insistence that since the statutory definition of basic services does not refer to "directory assistance," it is a non-basic service.

The sub-issue of statutory construction is thus squarely posed. We begin our analysis by observing that "interpretations of statutes by administrative agencies are customarily given respect and accorded deference by courts." *Collins v. McCanless*, 169 S.W.2d 850 (Tenn. 1943); *Riggs v. Burson*, 941 S.W.2d 44 (Tenn. 1997).

The TRA seemingly was cognizant of the long-standing principle that the legislative intent should be ascertained from the natural and ordinary meaning of the language used without a forced or subtle construction that would limit or extend the meaning of the language, *Hamblen County Ed. Asso.v. Bd. of Education*, 892 S.W.2d 428 (Tenn. Ct. App. 1994); *Worrall v. Kroger Co.*, 545 S.W.2d 736 (Tenn. 1977), since each party argued that the plain language of the statute supported its position, the TRA concluded that the language was susceptible of more than one meaning and hence was unclear, which justified recourse to its legislative history.

What we held in *BellSouth Tele. v. Greer*, 972 S.W.2d 663 (Tenn. Ct App. 1997) is apropos in the case at Bar:

The legislative process does not always produce precisely drawn laws. When the words of a statute are ambiguous or when it is just not clear what the legislature had in mind, courts may look beyond a statute's text for reliable guides to the statute's meaning. We consider the statute's historical background, the conditions giving rise to the statute, and the circumstances contemporaneous with the statute's enactment. (Citations omitted).

Courts consult legislative history not to delve into the personal, subjective motives of individual legislators, but rather to ascertain the meaning of the words in the statute. The subjective beliefs of legislators can never substitute for what was, in fact, enacted. There is a distinction between what the legislature intended to say is the law and what various legislators, as individuals, expected or hoped the consequences of the law would be. The answer to the former question is what courts pursue when they consult legislative history; the latter question is not within the courts' domain.

Relying on legislative history is a step to be taken cautiously. (Citations omitted). Legislative records are not always distinguished for their candor and accuracy, and the more that courts have come to rely on legislative history, the less reliable it has become. (Citation omitted). Rather than reflecting the issues actually debated by the legislature, legislative history frequently consists of self-serving statements favorable to particular interest groups prepared and included in the legislative record solely to influence the courts' interpretation of the statute. (Citations omitted).

Even the statements of sponsors during legislative debate should be evaluated cautiously. (Citation omitted). These comments cannot alter the plain meaning of a statute (citations omitted), because to do so would be to open the door to the inadvertent, or perhaps planned, undermining of statutory language. (Citation omitted). Courts have no authority to adopt interpretations of statutes gleaned solely from legislative history that have no statutory reference points. (Citation omitted). Accordingly, when a statute's text and legislative history disagree, the text controls. (Citation omitted).

The Legislature considered and debated at length the issue of whether directory service was a basic or non-basic service. A transcript of the debate is included in the record and we have carefully studied it; suffice to say that the Legislature, by a substantial majority, approved the bill as now codified, reflecting its intent to exclude directory service as a basic service.

The interpretation of a statute is strictly one of law, *Roseman v. Roseman*, 890 S.W.2d 27, (Tenn. 1994), and courts must construe statutes as they are written, *Jackson v. Jackson*, 210 S.W.2d 332 (Tenn. 1948). While the logicality of the argument of CAD is obvious, the counter-arguments of the TRA and BellSouth are equally logical: That basic services are those specifically enumerated in the statute, and that if every"use" of a telephone were a basic service, Unified could not increase its rates for any service during the first four years of the price regulation plan and the price freeze admittedly applies only to basic services. Upon a consideration of all the recognized principles of statutory construction, we conclude that the meaning attributed to the statute by the TRA is the correct one.

## The Five-Line Tariff

In the process of reviewing United's proposed rate filing, CAD discovered that United had raised the rates for residential customers with more than five access lines, and insisted that these lines were a basic service and subject to the statutory price freeze. Tenn. Code Ann. § 65-5-209(f). After hearing testimony concerning this issue, the TRA ruled that it should be heard in another docket. CAD challenges the action of the TRA, insisting that it had no authority to transfer the case to another docket after hearing proof on the issue in the case at Bar.

The tariff at issue was permitted to take effect by the Public Service Commission in October 1995. CAD argues that the tariff was never approved, but did not intervene in the proceeding.[1] TRA argues that it had the discretion to reopen the issue of the tariff in the case at Bar within a proceeding of its choosing. We agree that the TRA acted within its discretion in considering that the issue raised by CAD was more appropriately joined in another pending case. *See, South Central Bell Tele. Co. v. TPSC*, 675 S.W.2d 718 (Tenn. Ct. App. 1984). We are referred to no rule or statute which forbids the TRA from ordering that this issue should be heard in another docket, and thus cannot fault the TRA for doing so.

## The Grandfathering Issue

During the progress of the directory assistance docket, CAD raised the issue that United impermissibly raised rates for its ABC Service, described as a kind of advanced business service. A witness for CAD testified that United made some changes in its ABC Service, renamed it "Centrex Services," and increased its rates above those charged to ABC customers. CAD specifically alleges that Centrex Services is not a new service, but merely a new name with a new way of combining and pricing the service provided under the ABC Service tariff.

TRA argues that CAD has impermissibly sought appellate review by collaterally attacking an agency decision that was rendered in another contested case hearing initiated upon a complaint filed by a customer of United. Docker Number 96-00462 was assigned, a hearing on the merits was held, and a final judgment was rendered on October 3, 1996, which was modified to approve a stipulation between regarding ABC Service on January 22, 1997. These judgments required United, inter alia, to revise the terms of its central office-based service; to comply, United filed a tariff which included the grandfathering of ABC Service and a revised service called Centrex Services, which was approved by the TRA by Order entered January 22, 1997.

---

[1] New tariffs automatically became effective unless suspended. *See, Consumer Ad. Div. v. Bissell*, No. 01-A-01-9601-B-00049 (Tenn. Ct. App. 1996).

TRA further argues that since it found that Centrex Services was a unique bundling of products and pricing arrangements, it was not a service offered on June 6, 1995,[2] and that as a new service the Centrex tariff was "specifically considered and approved by the TRA in a prior docket and not found to be contrary to law."

It was further found by TRA that the proposed tariffs to obsolete ABC Service and that introduced Centrex Services were filed in September 1996 with a revision filed in December 1996. The initial filing was served on CAD which did not intervene or otherwise participate in the hearing.

The TRA thereupon determined that there was no legal basis for the position urged by CAD, which should not be permitted to attack collaterally a TRA decision for which appellate review is time barred.[3]

CAD contends that grandfathering is not permitted under Tennessee law because a telephone company must "treat all alike and it cannot discriminate in favor of one of its patrons against another," citing *Breeden v. Southern Bell Telephone & Telegraph Co.*, 285 S.W.2d 346 (Tenn. 1955). If, as CAD argues, United provides services to one group of customers while refusing to provide the same service to another group - new customers - we agree that the practice is contrary to Tennessee law. Tenn. Code Ann. § 65-4-122; § 65-5-204.

TRA ordered United to obsolete the ABC Service tariff following a docket hearing involving a complaining customer. TRA found that the ABC Service tariff as it applied to the complaining customer, ZETA Images, Inc., was insufficient, discriminatory, unreasonable and excessive.

The Centrex tariff was approved January 22, 1997. CAD insists that it is no different from the ABC tariff; that the ABC Service and Centrex Services are the same.

There are differences between the tariffs. ABC Service is distant-restrictive but Centrex Services is not. ABC Service charges only for outgoing traffic over Network Access Registers, while Centrex Services charges for outgoing and incoming traffic. ABC Service requires a customer to purchase basic features separately, while Centrex Services included the basic features in the price of the line. Minimum service for ABC Service requires the use of two access lines and one NAR while Centrex Services requires two access lines and two NARs.

---

[2] Referring to the language of the tariff then in effect.

[3] Judicial review must be sought within sixty days from entry of judgment. Tenn. Code Ann. § 4-5-322; Rule 12(a) T.R.A.P.

Grandfathering[4] is not, per se, illegal. But if it results in discrimination between old and new customers, and is unjust or unduly preferential and thus violative of the statutes, it cannot be permitted. The thrust of CAD's argument is that ABC and Centrex Services are essentially the same, and to require one class of customer to pay more for the same service is unjust discrimination and unlawful.

The record reflects that if the ABC Service had been obsoleted without grandfathering the existing customers, they would have been required to pay the rate under the Centrex Services tariff, an increase in their cost of service. United has the right to price a non-basic service as it chooses, but any rate increase must be accompanied by off setting rate reductions which result in the rate increase being revenue neutral. Otherwise, United would be in violation of Tennessee Code Annotated § 65-5-209(e). The TRA argues that without a showing of a revenue neutral rate increase, United cannot obey its order to obsolete ABC Service without grandfathering the existing service. This argument has merit. If United is required to offer ABC Service to existing and new customers, it could not obsolete that service unless the service was withdrawn. But under the revenue neutral requirements, United could only obsolete a service where existing customers did not experience a rate increase or where a rate increase was neutralized by other rate deceases.

The CAD argues that grandfathering constitutes unjust discrimination and an undue preference as a matter of law and, is illegal in this case because the company has the technical ability to offer the service but chooses to offer it only to a certain group of customers. As we have seen, the statutes only prohibit discrimination that is unjust or unreasonable or preferences that are undue or unreasonable. The TRA is permitted to establish separate classifications of customers for the purposes of assessing different rates and has done so many times over the years.

Tennessee Code Annotated § 65-4-122 provides as pertinent here:

> (a) If any common carrier or public service company, directly or indirectly, by any special rate, rebate, drawback or other device, charges, demands, collects, or receives from any person a greater or less compensation for any service of a like kind under substantially like circumstances and conditions, and if such common carrier or such other public service company makes any reference between the parties aforementioned such common carrier or other public service company commits unjust discrimination, which is prohibited and declared unlawful.
>
> (b) Any such corporation which charges, collects, or receives more than a just and reasonable rate of toll or compensation for service in

---

[4] A provision in a new law or regulation exempting those already in or a part of an existing system which is being regulated. An exception to a restriction that allows those already doing something to continue doing it even if they would be stopped by the new restriction. Black's Law Dictionary, 699 (6th ed. 1990).

this state commits extortion, which is prohibited and declared unlawful.

(c) It is unlawful for any such corporation to make or give an undue or unreasonable preference or advantage to any particular person or locality, or any particular description of traffic or service, or to subject any particular person, company, firm, corporation, or locality, or any particular description of traffic or service to any undue or unreasonable prejudice or disadvantage.

The operative language "for any service of a like kind under substantially like circumstances and conditions" is significant in this case because there is material proof that the Centrex Services was a new service, and one that was not offered on June 6, 1995. We cannot say that the action of the TRA was not supported by substantial and material evidence.

## Exemptions from Directory Assistance Charges

United argues that while the TRA properly determined that directory assistance is a non-basic service, thus allowing United to set rates as it deems appropriate subject to certain safeguards, the TRA impermissibly ordered it to amend its tariff (1) to increase the directory assistance free call allowance to six inquiries with an allowance of two telephone numbers per inquiry per billing period; (2) to exempt from directory assistance charges those customers who are unable to use the directory owing to visual or physical disability, and (3) to exempt from directory assistance charges residential customers who are older than sixty-five years. United argues that these requirements are in excess of the authority of TRA. We disagree. Tennessee Code Annotated § 65-4-117 provides:

The Authority has the power to:

\*   \*   \*   \*   \*

(3) after hearing, by order in writing, fix just and reasonable standards, classifications, regulations, practices and services to be furnished, imposed, observed and followed thereafter by any public utility.

This statute is required to be liberally construed, Tennessee Code Annotated § 65-4-106, and thus any reasonable doubt as to whether the language is sufficiently broad to include the right of TRA to impose conditions should be resolved in favor of the existence of that right. We therefore conclude that the action United complains of is authorized by the statutes.

The judgment is affirmed. Costs are assessed to CAD and United Telephone equally.

-9-

PER CURIAM